UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL EUGENE NELSON,<br>Plaintiff | )<br>)<br>)<br>) | CIVIL ACTION NO. 1:21-CV-450 |
| v. | )<br>) | (ARBUCKLE, M.J.) |
| KILOLO KIJAKAZI,<br>Defendant | )<br>)<br>) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Carl Eugene Nelson, III ("Nelson"), seeks judicial review of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying his claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. The Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have consented to have a Magistrate Judge preside over all proceedings in this case. (Doc. 10).

After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, we find the Commissioner's final decision is supported by substantial evidence. Accordingly, the Commissioner's final decision will be affirmed.

## II.   BACKGROUND AND PROCEDURAL HISTORY

On December 13, 2018, Nelson protectively filed[1] applications for disability insurance benefits and supplemental security income. (Admin. Tr. 15; Doc. 14-2, p. 16). In each application, Nelson alleged that he has been disabled since October 30, 2014. *Id*. After the Commissioner denied his claims at the initial and reconsideration levels of administrative review, Nelson requested an administrative hearing. *Id*. On July 31, 2020, Nelson, represented by counsel, testified at a telephone hearing before Administrative Law Judge ("ALJ") Gwendolyn M. Hoover. (Admin. Tr. 15, 28; Doc. 14-2, pp. 16, 29).

The ALJ determined that Nelson had not been disabled from October 30, 2014 (the alleged onset date), through August 12, 2020 (the date of the decision). *Id*. And so, she denied Nelson benefits. *Id*. Nelson appealed the ALJ's decision to the Appeals Council, which denied his request for review on January 13, 2021. (Admin. Tr. 1–3; Doc. 14-2, pp. 2-4). This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

On March 12, 2021, Nelson, through counsel, began this action by filing a complaint requesting review of the Commissioner's decision. (Doc. 1).

---

[1]   "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017). "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id*.

The Commissioner filed an answer and a certified transcript of the administrative proceedings. (Docs. 13, 14). The parties then filed their briefs. (Docs. 17, 20, 21). This matter is ripe for decision.

## III.    LEGAL STANDARDS

Before looking at the merits of this case, it is helpful to restate the legal principles governing Social Security Appeals. We will also discuss the standards relevant to the resolution of the specific issues Plaintiff raises in this case.

### A.    SUBSTANTIAL EVIDENCE REVIEW—THE ROLE OF THIS COURT.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner."[2] But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings.[3] "[T]he threshold for such evidentiary sufficiency is not high."[4] Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[5]

---

[2] *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

[3] *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019).

[4] *Biestek*, 139 S. Ct. at 1154.

[5] *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla."[6] A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.[7] But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence."[8] "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole."[9]

The question before this court, therefore, is not whether Nelson was disabled, but whether substantial evidence supports the Commissioner's finding that he was not disabled and whether the Commissioner correctly applied the relevant law.

### B.   INITIAL BURDENS OF PROOF, PERSUASION, AND ARTICULATION FOR THE ALJ

To receive benefits under Title II or Title XVI of the Social Security Act, a claimant generally must demonstrate an "inability to engage in any substantial

---

[6] *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).

[7] *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

[8] *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

[9] *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[10] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy.[11]

To receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.[12] Unlike with disability insurance benefits under Title II of the Social Security Act, "[i]nsured status is irrelevant in determining a claimant's eligibility for

---

[10] 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. §1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

[11] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

[12]  42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)). "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)). Here, the ALJ determined that Nelson met the insured-status requirements through June 30, 2021. (Admin. Tr. 17; Doc. 14-2, p. 18).

supplemental security income benefits" under Title XVI of the Social Security Act.[13]
Supplemental Security Income "is a federal income supplement program funded by
general tax revenues (not social security taxes)" "designed to help aged, blind or
other disabled individuals who have little or no income."[14]

The ALJ follows a five-step sequential-evaluation process to determine
whether a claimant is disabled.[15] Under this process, the ALJ must sequentially
determine: (1) whether the claimant is engaged in substantial gainful activity; (2)
whether the claimant has a severe impairment; (3) whether the claimant's
impairment meets or equals a listed impairment; (4) whether the claimant is able to
do his or her past relevant work; and (5) whether the claimant is able to do any other
work, considering his or her age, education, work experience, and residual functional
capacity ("RFC").[16]

The ALJ must also assess a claimant's RFC between steps three and four.[17]
The RFC is "'that which an individual is still able to do despite the limitations caused

---

[13] *Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar. 22, 2017).

[14] *Id.*

[15] 20 C.F.R. §§ 404.1520(a), 416.920.

[16] 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

[17] *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).

by his or her impairment(s).'"[18] In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis.[19]

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process.[20] But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his] medical impairments, age, education, past work experience, and residual functional capacity."[21]

The ALJ's disability determination must also meet certain basic substantive requisites. Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests.[22] "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."[23] The "ALJ may not reject pertinent or probative evidence without

---

[18] *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[19] 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

[20] *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).

[21] *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

[22] *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

[23] *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).

explanation."[24] Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"[25]

## C. GUIDELINES FOR THE ALJ'S EVALUATION OF MEDICAL OPINION EVIDENCE

Because Nelson's arguments concern the ALJ's handling of opinion evidence, we start with a brief overview of the regulations regarding opinion evidence. The regulations in this regard are different for claims filed before March 27, 2017, and for claims like Nelson's, filed on or after March 27, 2017. Specifically, the regulations applicable to claims filed on or after March 27, 2017, ("the new regulations") changed the way the Commissioner considers medical opinion evidence and eliminated the provision in the regulations applicable to claims filed before March 27, 2017, ("the old regulations") that granted special deference to opinions of treating physicians.

The new regulations have been described as a "paradigm shift" in the way medical opinions are evaluated.[26] Under the old regulations, "ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy

---

[24] *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).

[25] *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

[26] *Densberger v. Saul*, No. 1:20-CV-772, 2021 WL 1172982, at *7 (M.D. Pa. Mar. 29, 2021).

of medical source opinions with treating sources at the apex of this hierarchy."[27] But under the new regulations, "[t]he range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis."[28]

Under the old regulations, the ALJ assigns the weight he or she gives to a medical opinion.[29] And if "a treating source's medical opinions on the issue(s) of the nature and severity of [a claimant's] impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," the Commissioner "will give it controlling weight."[30] Under the old regulations, where the Commissioner does not give a treating source's medical opinion controlling weight, it analyzes the opinion in accordance with a number of factors: the "[l]ength of the treatment relationship and the frequency of examination," the "[n]ature and extent of the treatment relationship," the "[s]upportability" of the opinion, the "[c]onsistency" of the opinion with the record as a whole, the "[s]pecialization" of the treating source, and any other relevant factors.[31]

---

[27] *Id.*

[28] *Id.*

[29] 20 C.F.R. §§ 404.1527(c), 416.927(c).

[30] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

[31] 20 C.F.R. §§ 404.1527(c)(2)–(c)(6), 416.927(c)(2)–(c)(6).

Under the new regulations, however, the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."[32] Rather than assigning weight to medical opinions, the Commissioner will articulate "how persuasive" he or she finds the medical opinions.[33] And the Commissioner's consideration of medical opinions is guided by the following factors: supportability; consistency; relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); specialization of the medical source; and any other factors that tend to support or contradict the opinion.[34] The most important of these factors are the "supportability" of the opinion and the "consistency" of the opinion.[35] As to supportability, the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical

---

[32] 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

[33] 20 C.F.R. §§ 404.1520c(b), 416.920c(b).

[34] 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

[35] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

finding(s) will be."[36] And as to consistency, those regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."[37]

The ALJ must explain how he or she considered the "supportability" and "consistency" of a medical source's opinion.[38] Generally, the ALJ may, but is not required to, explain his or her consideration of the other factors.[39] But if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors.[40] With these legal standards in mind we turn to the merits of this case.

## IV.   DISCUSSION

Nelson raises the following issues in his statement of errors:

1.   The ALJ's RFC determination is not supported by substantial evidence because she failed to properly evaluate the opinion of treating physician Mark Lauer, M.D.

---

[36] 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[37] 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

[38] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

[39] *Id.*

[40] 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

2.    The ALJ's RFC determination is not supported by substantial evidence because she failed to properly evaluate the opinion of consulting examiner, Stacey Trogner, Psy.D.

(Doc. 17, p. 3).

We begin our analysis by summarizing the ALJ's decision. Then we will address each of Nelson's arguments separately.

### A.    THE ALJ'S DECISION DENYING NELSON'S APPLICATIONS FOR BENEFITS

On August 12, 2020, the ALJ denied Nelson's claims for benefits. (Admin. Tr. 15-28; Doc. 14-2, pp. 16-29). At step one of the sequential-evaluation process, the ALJ found that Nelson engaged in substantial gainful activity between November 2014 and February 2015, but that Nelson had not engaged in substantial gainful activity since February 2015. (Admin. Tr. 17-18; Doc. 14-2, pp. 18-19).

At step two of the sequential-evaluation process, the ALJ found that Nelson had the following severe impairments: bursitis and arthritis of the spine, lumbosacral radiculopathy, chronic low back pain with bilateral sciatic pain, degenerative joint disease of the right knee, non-insulin dependent type 2 diabetes mellitus, peripheral neuropathy, obesity, major depressive disorder, panic disorder, generalized anxiety disorder, post-traumatic stress disorder and intermittent explosive disorder. (Admin. Tr. 18; Doc. 14-2, p. 19). The ALJ also found that Nelson had alcohol use disorder and cannabis use disorder, which the ALJ determined were non-severe impairments. *Id.*

At step three of the sequential-evaluation process, the ALJ found that Nelson did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. More specifically, the ALJ discussed Listings 1.02, 1.04, 11.14, 12.04, 12.06, 12.08, and 12.15, and he determined that Nelson did not meet any of those listings. (Admin. Tr. 19; Doc. 14-2, p. 20). In connection with her discussion of the mental health listings, the ALJ concluded that Nelson had mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting and managing himself. (Admin. Tr. 19-20; Doc. 14-2, p. 20-21).

The ALJ then determined that Nelson has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with some non-exertional limitations. (Admin. Tr. 21; Doc. 14-2, p. 22). The ALJ determined that Nelson is limited to occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs and never climbing ladders, ropes, or scaffolds. *Id*. Nelson must avoid concentrated exposure to extreme humidity and wetness. *Id*. "He is limited to simple and routine tasks but would have the ability to make simple work-related decisions and can tolerate occasional changes in the work setting." *Id*. Nelson "can tolerate occasional interaction with the public and occasional interaction with

co-workers." *Id*. In making this RFC assessment, the ALJ reviewed Nelson's symptoms and the medical opinion evidence. *Id*.

At step four of the sequential-evaluation process, the ALJ found that Nelson is unable to do his past relevant work as a heavy equipment operator (DOT# 859.683-010), which is skilled work, generally performed at a medium exertional level but which was actually performed at the very heavy exertional level, a parts manager (DOT# 185.167-038), which is skilled work, generally performed at a light exertional level but which was actually performed at the medium exertional level, a warehouse manager (DOT #184.167-114), which is skilled work, generally performed at a light exertional level but which was actually performed at the very heavy exertional level, a crane operator (DOT #921.663-022), which is semi-skilled work, generally performed at a medium exertional level but which was actually performed at the light exertional level, and a delivery driver (DOT #292.353-010), which is semi-skilled work, generally performed at a medium exertional level but which was actually performed at the heavy exertional level. (Admin. Tr. 26; Doc. 14-2, p. 27).

At step five of the sequential-evaluation process, considering Nelson's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs that exist in significant numbers in the national economy that Nelson could perform, including mail clerk (DOT# 209.687-

026), merchandise marker (DOT# 209.587-034), and housekeeping cleaner (DOT# 323.687-014), each with at least 86,150 jobs in the national economy. (Admin. Tr. 27; Doc. 14-2, p. 28).

In sum, the ALJ concluded that Nelson was not disabled from October 30, 2014, through the date of her decision on August 12, 2020. (Admin. Tr. 27-28; Doc. 14-2, pp. 28-29). Thus, the ALJ denied Nelson's claims for disability insurance benefits and supplemental security income. *Id*.

### B.   EVALUATION OF DR. LAUER'S OPINION

On October 20, 2014, Nelson injured his back at work. On November 4, 2014, Dr. Lauer examined him. (Admin. Tr. 426; Doc. 14-7, p. 46). During the examination, Dr. Lauer noted that Nelson's standing range of motion in his lumbar spine was slow but complete in all planes. X-rays performed that day showed degenerative changes at L4-L5 and L5-S1. *Id*. Dr. Lauer diagnosed lumbar sacral strain and assessed that Nelson could work, but his overall lifting was limited to twenty pounds. *Id*. His pain persisted, and he saw Dr. Lauer several more times.

On March 15, 2015, after another examination, Dr. Lauer assessed the following work restrictions:

| | |
|---|---|
| Limited standing and walking | Starting 1/29/15 Continuing |
| 10 pounds lifting, pulling, pushing | Starting 2/04/15 Continuing |
| 10 pound weight limit, Alternate sitting and standing | Starting 2/04/15 Continuing |

No bending/twisting/kneeling/squatting    Starting 2/04/15 Continuing

(Admin. Tr. 427; Doc. 14-7, p. 47).

In her decision, the ALJ found that these limitations were "generally persuasive." In doing so she explained:

> I have considered the work restrictions from November 2014 until February 2015 by Thomas Ladley, PA-C, and Mark Lauer, M.D., that the claimant could lift up to 20 pounds (Exhibit 2F/34). Beginning February 4, 2015, the claimant was limited to 10 pounds of lifting, pushing and pulling, would require the ability to alternate between sitting and standing, and was limited to no bending, twisting, kneeling or squatting (Exhibit 2F/35). These opinions are generally persuasive, as they are supported by the findings via MRI and EMG noted above and the claimant's reports of back pain to his medical providers. However, the finding that he would have to alternate between sitting and standing and perform no bending, twisting, kneeling or squatting is not supported by the longitudinal evidence, as he reported improvement in his pain with conservative treatment, the lumbosacral x-ray performed by the consultative examiner was normal, he was able to perform a full squat at the consultative examination, and he generally presents with intact motor and steady gait on examination.

(Admin. Tr. 24-25; Doc. 14-2, pp. 25-26). As a result of this analysis, the lifting limitation, sit/stand option, and limitation to no bending, twisting, kneeling, and squatting was excluded from the ALJ's RFC assessment. Instead, the ALJ limited Nelson to "occasional" (from very little to one-third of each workday) stooping (bending), kneeling, and crouching (squatting). Nelson was also limited to "light" work, which not require him to lift more than twenty pounds.

Nelson argues that substantial evidence does not support the ALJ's rejection of the lifting, sit/stand, and postural limitations.

First, Nelson argues that the ALJ did not consider his treatment relationship with Dr. Lauer. Dr. Lauer treated Nelson for injuries related to his accident between the date of the accident, October 30, 2014, until Dr. Lauer discharged Nelson on March 10, 2015. (Admin. Tr. 17; Doc. 14-2, p. 18); (Doc. 20, p. 14). We construe this argument as an allegation that the ALJ did not *articulate* how he considered the treatment relationship. Under the applicable regulations, the ALJ is only required to articulate his or her consideration of the supportability and the consistency of each medical opinion unless two opinions are equally persuasive when those factors are applied.[41] The ALJ did not find Dr. Lauer's opinion equally persuasive as other opinions, and, therefore, did not need to articulate how he considered the treatment relationship factors. (Admin. Tr. 24-25; Doc. 14-2, pp. 25-26).

Second, Nelson argues that the ALJ mischaracterized the record when she noted that he was able to perform a full squat. The Commissioner argues that the ALJ summarized Nelson's ability to squat in detail earlier in her opinion, and that her failure to repeat that Nelson had to hold on to the wall while squatting does not undermine her conclusion.

Nelson and the Commissioner both accurately describe the consultative examination where Nelson was asked to squat. During the examination, the nurse practitioner noted that Nelson "demonstrated a full squat, but he needed to hold onto

---

[41] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

the wall to do so due to low back pain causing weakness in his bilateral lower extremities." (Admin. Tr. 684; Doc. 14-9, p. 81).[42] When discussing that examination, the ALJ wrote that Nelson could "perform a full squat, but he needed to hold onto the wall to do so due to low back pain that reportedly caused lower extremity weakness." (Admin. Tr. 23; Doc. 14-2, p. 24). Reading the decision as a whole, the ALJ was aware and considered that Nelson could not perform a full squat without holding on to the wall. Even this more limited ability to "crouch" or "squat" is inconsistent with Dr. Lauer's assessment that Nelson could never do so. Accordingly, we find that the ALJ did not mischaracterize the record, and that the ALJ's interpretation of this evidence was reasonable.

Third, Nelson alleges that the ALJ did not explain why Nelson's November 2014 MRI of his lumbar spine, August 2019 right knee x-ray, and May 2020 lumbar spine x-ray were inconsistent with Dr. Lauer's opinion. The ALJ noted in her decision that the November 2014 MRI showed "mildly degenerative bulging annuli at L4-5 and L5-1, that an August 2019 knee x-ray showed minimal degenerative changes and trace joint effusion, and the May 17, 2020 lumbar x-ray was normal and

---

[42] After observing Nelson squat while holding the wall, the consultative examiner concluded that Nelson could "occasionally" crouch (i.e. squat). (Admin. Tr. 689; Doc. 14-9, p. 86); *see also* Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C available on Westlaw Edge at SCODICOT APP C (defining "crouching" as "bending body downward and forward by bending legs and spine.").

showed no evidence of degenerative disc disease. (Admin. Tr. 22; Doc. 14-2, p. 23). These findings, when viewed along with the record as a whole, are inconsistent with a condition that requires Plaintiff to alternate between sitting and standing at will and avoid all other postural activity. Therefore, we are not persuaded that the ALJ's reliance on these records was misplaced.

Fourth, Nelson argues that the ALJ did not explain why she rejected Dr. Lauer's ten-pound lifting restriction. The ALJ stated that Nelson's symptoms improved with conservative treatment during Dr. Lauer's treatment. (Admin. Tr. 25; Doc. 14-2, p. 26).  The ALJ also found the opinions of Dr. Park and N.P. Hammon persuasive, and both found that Nelson can lift at least 20 pounds; Dr. Park found that Nelson could carry 25 pounds. (Admin. Tr. 24; Doc. 14-2, p. 25). We therefore find that, the decision as a whole, supports the ALJ's assessment that Nelson can lift 20 pounds.

### C.   EVALUATION OF DR. TROGNER'S OPINION

On July 17, 2019, Dr. Trogner examined Nelson and issued a medical source statement about his ability to do mental work-related activities. During the examination, Nelson reported that he completed a 12-step anger management program while incarcerated, and attends anger management and other programs through the VA three times per week. (Admin. Tr. 696; Doc. 14-9, p. 93). Despite this treatment, Nelson reported that he continues to have periods of anger. (Admin.

Tr. 698; Doc. 14-9, p. 95). He was arrested on assault charges in 2018 and was sentenced to one year of house arrest. He was on probation as of July 2019. *Id.* During the examination itself, Nelson was cooperative and his manner of relating to others was adequate. *Id.* Nelson reported that he takes the VA public transportation and tries to interact in the socialization room. (Admin. Tr. 700; Doc. 14-9, p. 97). He admitted, however, that his family relationships are stressed. He has no contact with his mother and his father is deceased. He is closest with his stepson. *Id.* He also reported that he spends at least some days watching his 2-year-old grandson. *Id.*

Dr. Trogner assessed that Nelson had "marked" limitations, defined as "serious limitations" in interacting appropriately with the public, interacting appropriately with supervisors, interacting appropriately with co-workers, and responding appropriately to usual work situations and changes in a routine work setting. (Admin. Tr. 703; Doc. 14-9, p. 100).

In her decision, the ALJ found that Dr. Trogner's opinion was "not wholly persuasive." In doing so, she explained:

> On July 17, 2019, Stacy Trogner, Psy.D., performed a Mental Status Evaluation, and opined that the claimant has mild limitation in the ability to understand, remember and carry out simple instructions, make judgments on simple work-related decisions, moderate limitation in the ability to understand, remember and carry out complex instructions, make judgments on complex work-related decisions, and marked limitation in the ability to interact appropriately with the public, coworkers and supervisors and respond appropriately to usual work situations and to changes in a routine work setting (Exhibit 9F). This opinion is not wholly persuasive, as the finding that the claimant has

marked limitations in the abovementioned areas is not consistent with the largely intact mental status exam—particularly as to his cooperativeness, friendliness, good eye contact and adequate overall manner of relating—and overall medical evidence that shows routinely normal mental status examination findings in the treatment records. The finding that he has marked social limitation is inconsistent with his participation and friendly demeanor during group sessions and appears to be primarily based upon the claimant's subjective reports at the consultative examination.

(Admin. Tr. 25; Doc. 14-2, p. 26). Instead, the ALJ found that Nelson could tolerate occasional (two hours or less per day) interaction with the public and co-workers. (Admin. Tr. 21; Doc. 14-2, p. 22). Nelson argues that the ALJ's rationale for disregarding the "marked" limitation for a more modest limitation to "occasional" social interaction is not supported by substantial evidence.

Nelson alleges that the ALJ improperly evaluated the opinion of Dr. Trogner because, in rejecting Dr. Trogner's findings of marked limitations in interacting with others, the ALJ stated that Dr. Trogner's opinion was based upon Nelson's subjective complaints. (Doc. 17, pp. 10-12). Nelson further alleges the ALJ erred in evaluating Dr. Trogner's opinion because Dr. Trogner's opinion was based on medical evidence because Dr. Trogner followed a "symptoms-signs-laboratory findings protocol" and because some evidence of record, including Nelson's

incarceration and therapy, support Dr. Trogner's findings of marked limitations. (Doc. 17, pp. 13-15). In support of his position, Nelson relies on *Morales v. Apfel*.[43]

In response, the Commissioner contends that the ALJ adequately explained her reasons for rejecting parts of Dr. Trogner's opinion and that *Morales* does not apply and does not undermine the ALJ's rejection of parts of Dr. Trogner's opinion. (Doc. 20, pp. 20-24). The Commissioner also contends that Nelson's citation of evidence which supports Dr. Trogner's opinion does not demonstrate error by the ALJ. (Doc. 20, p. 24).

Nelson responds *Morales* is applicable and prevents an ALJ from rejecting "the opinion of a physician based only on objective findings [including mental status findings] in therapy notes." (Doc. 21, pp. 4-5). Nelson further contends that neither *Torres v. Barnhart*,[44] which was cited by the Commissioner—nor even the Social Security Administration's own guidelines, as demonstrated in Listing 12.00(C)(2), allow an ALJ to "reject the opinion of a physician based only on objective findings [including mental status findings] in therapy notes." (Doc. 21, pp. 4-6).

Both Nelson and the Commissioner focus on the issue of whether the ALJ can base her rejection of a medical opinion exclusively upon a physician's treatment notes, and each argues about the applicability of *Morales* and *Torres*. Nelson argues

---

[43] 225 F.3d 310, 319 (3d Cir. 2000).

[44] 139 F. App'x 411 (3d Cir. 2005).

that *Morales* does not allow an ALJ to use treatment notes exclusively to reject a physician's opinion, (Doc. 17, p. 11), while the Commissioner argues that *Morales* does not apply and *Torres* allows an ALJ to discount a treating physician's opinion based upon treatment notes. (Doc. 20, p. 21). Therefore, we will briefly summarize relevant portions of both cases.

In *Morales*, which was decided under the old medical opinion evidence regulations, the plaintiff's treating physician opined that the plaintiff was seriously limited in his ability to perform work-related tasks, work with co-workers and the public, maintain attention, and other skills.[45] Two other physicians submitted opinions which largely corroborated the plaintiff's treating physician's opinion, even though they also indicated that the plaintiff appeared to be exaggerating his symptoms.[46] Despite these medical opinions, the ALJ rejected the treating physician's opinion, explaining that he did not believe the plaintiff's testimony at the hearing, that some doctors had found the plaintiff to exaggerate symptoms, and that the treating physician treatment notes stated the plaintiff was stable with medication.[47] The Third Circuit stated that an ALJ's credibility judgments and "amorphous impressions, gleaned from the record," alone are insufficient to

---

[45] *Morales*, 225 F.3d at 317.

[46] *Id.* at 318.

[47] *Id.* at 318-319.

"override the medical opinion of a treating physician that is supported by the record."[48] The Third Circuit also stated: "In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion."[49] In *Morales*, the Third Circuit stated that the ALJ's personal observations of a claimant and a treating physician's observations during treatment (where workplace stressors are absent) ""carry little weight in cases involving medically substantiated psychiatric disability,"" especially in cases involving affective or personality disorders marked by anxiety.[50]

*Torres*, bears a few similarities to *Morales*. In *Torres*, the ALJ rejected the treating physician's opinions, explaining that therapy notes and mental status notes contradicted the treating physician's opinion and demonstrated remarkable improvement in the plaintiff's condition with medication.[51] The ALJ also noted that some doctors had found the plaintiff to exaggerate symptoms.[52] The plaintiff argued that the ALJ selected some treatment notes and ignored others, but the court found

---

[48] *Id.* at 318.

[49] *Id.* at 317–18 (citations omitted).

[50] *Id.* at 319 (quoting *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)).

[51] *Torres*, 139 F. App'x at 414.

[52] *Id.*

that the plaintiff, in so arguing, primarily cited treatment notes which merely indicated what the plaintiff himself had reported to the physician.[53] The court found that the ALJ did not err because the ALJ "assessed those notes as a whole to reach her conclusion of substantial improvement."[54]

> Unlike in *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), upon which Claimant relies, the ALJ [in *Torres*] did not inappropriately reject the treating physician's opinion on the basis of credibility judgments, speculation, or lay opinion. Instead, the ALJ's finding was based on the objective medical evidence contained in the psychotherapy treatment notes, and is not "overwhelmed" by contrary evidence in the record.[55]

Despite the conflict Nelson and the Commissioner find in *Morales* and *Torres*, we find that *Torres* builds upon *Morales*. In *Morales*, the ALJ discredited the medical opinions of three doctors and the plaintiff's testimony, relying instead exclusively on the ALJ's credibility judgment of the plaintiff and some treatment notes, to find an RFC with lesser restrictions that any of the three doctors opined. In *Torres*, the ALJ relied upon the opinion of a non-treating physician *and* the demonstrated improvement recorded in the treating physician's treatment notes as a whole to find an RFC which was less restrictive than opined by the treating physician but more restrictive than opined by a consultative examiner. In other words, the Third Circuit held in *Morales* and *Torres*, collectively, that cherry-picked treatment

---

[53] *Id.*

[54] *Id.* (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

[55] *Id.* at 15.

notes and credibility assessments alone are insufficient to discredit a medical opinion, but treatment notes—reviewed wholistically—and an opinion by another medical source *are* sufficient to discredit a medical opinion.[56] *Torres* further demonstrates that a plaintiff may not use his own subjective statements documented in treatment notes as counter-evidence to prove that the ALJ erred in reviewing or mischaracterized treatment notes.[57]

Therefore, both *Morales* and *Torres* apply in this case. As in both, the ALJ relied upon mental status exams (a section within treatment notes) to demonstrate that Dr. Trogner's opinion lacked consistency with Nelson's medical records. (Admin. Tr. 25; Doc. 14-2, p. 26). This alone may not be enough to justify finding Dr. Trogner's opinion unpersuasive. However, additional evidence here creates sufficient justification.

Here, the ALJ stated that Dr. Trogner's opinion "appears to be primarily based upon the claimant's subjective reports at the consultative examination." *Id.* This statement is brief but is largely correct. Explanations at the beginning of Dr.

---

[56] *Morales*, 225 F.3d at 317; *Torres*, 139 F. App'x at 414 (3d Cir. 2005).

[57] *Torres*, 139 F. App'x at 414 ("[T]he ALJ did not improperly ignore treatment notes which contradicted her opinion, but rather assessed those notes as a whole to reach her conclusion of substantial improvement . . . . Notably, the entries relied upon by Claimant to demonstrate the limit of his progress mostly detail Claimant's self-reported symptoms, as opposed to the doctor's and therapist's numerous assessments of continual improvement.").

Trogner's medical opinion are filled with phrases indicating that all evidence reviewed by Dr. Trogner was garnered from Nelson's statements to Dr. Trogner or from Dr. Trogner's observations of Nelson during the consultative examination. (Admin. Tr. 696-701; Doc. 14-9, pp. 93-98). These explanations contain no references to any records reviewed by Dr. Trogner. *Id.* Further, within the medical source statement, Dr. Trogner provides no explanations of her opinions except that her findings are "related to dep[ression]/anxiety/anger" and that, in forming her opinions, she relied upon Nelson's "mental status." Nelson argues that statements by claimants are useful and necessary for mental health specialists to form opinions, and, therefore, that the ALJ could not reject Dr. Trogner's opinion because it was based upon Nelson's subjective statements and self-reports. (Doc. 21, p. 6). However, there is a difference between *analysis of* subjective statements by a mental health professional for the purpose of diagnosis and *reliance on* subjective statements by a mental health professional for diagnosis. Here, Dr. Trogner provides little, if any, explanation of the way she evaluated Nelson's subjective statements. (*See* Admin. Tr. at 696-704; Doc. 14-9, pp. 93-101).

Under the new regulations, an ALJ must evaluate the supportability and the consistency of each medical opinion.[58] Here, the ALJ has evaluated the

---

[58] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

supportability of Dr. Trogner's opinions—the relevance of the evidence and explanations provided by Dr. Trogner to support her opinions. The ALJ stated that the opinions were based upon the claimant's subjective reports, and Dr. Trogner's opinion reveals this to be true. (Admin. Tr. 25; Doc. 14-2, p. 26). The ALJ evaluated the consistency of Dr. Trogner's medical opinions—that is, their consistency with the medical record as a whole. The ALJ found that the opinions were inconsistent with mental status examinations during treatment, which demonstrated participation and friendly demeanor, and were inconsistent with mental status examinations during the consultative examination, which indicated appropriate eye contact and adequate manner of relating. (*See* Admin. Tr. 25, 669; Doc. 14-2, p. 26, Doc. 14-9, p. 66).

Finally, treatment notes—reviewed wholistically—and an opinion by another medical source *are* sufficient to discredit the opinion of the treating physician.[59] The ALJ found the opinions of Drs. Williams and Fink persuasive, and relied upon those opinions, rather than the opinion of Dr. Trogner, in formulating Nelson's RFC.

Therefore, we find that the ALJ provided sufficient evidence and explanations to justify her rejection of portions of Dr. Trogner's opinions. Nelson's second assignment of error cannot be sustained.

---

[59] *Torres*, 139 F. App'x at 414.

## V.     CONCLUSION

For the foregoing reasons, the decision of the Commissioner will be upheld.

An appropriate order follows.


Date: March 27, 2023                          BY THE COURT

                                              _s/William I. Arbuckle_
                                              William I. Arbuckle
                                              U.S. Magistrate Judge